*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CM-0010

MICHAEL M. HAWKINS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2022-CMD-005083)

(Ann O'Regan Keary, *Judge*)
(Robert D. Okun, *Judge*)

(Argued February 21, 2024     Decided August 6, 2026)

*Lisa S. Resnikoff* for appellant.

*David P. Saybolt*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *John P. Mannarino*, *Anthony Cocuzza*, and *Lauren Miller*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and HOWARD, *Associate Judges*, and THOMPSON,[*] *Senior Judge*.

---

[*] Senior Judge Fisher was originally assigned to this case. Following Judge Fisher's retirement, effective August 22, 2024, Judge Thompson was assigned to take his place on this panel.

Opinion of the court by *Associate Judge* BECKWITH.

Dissenting opinion by *Senior Judge* THOMPSON at page 27.

BECKWITH, *Associate Judge*: This case presents a question about the timeliness of the government's compliance with its obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), to disclose favorable evidence—specifically, a security guard's statements that she had viewed private surveillance video of the scene of the alleged offense and what she saw did not match the complainant's description of the incident. Here the government turned evidence of the security guard's statements over to appellant Michael Hawkins well in advance of trial but after the footage the security guard described had already been deleted. Because the government failed to turn over the favorable evidence in its possession in time for the defense to use it effectively, and because earlier disclosure of that evidence was reasonably likely to have affected the result of the trial in this case, we vacate Mr. Hawkins's convictions for attempted threats and attempted possession of a prohibited weapon.

## I.

The evidence at Mr. Hawkins's bench trial showed the following. On the day of the offense, Annie Davis, the complainant, was sitting in her car, which was parallel parked on I Street SE directly behind Mr. Hawkins's car. According to Ms. Davis's testimony, she honked at Mr. Hawkins when he backed up his car and got

too close to her front bumper. In response, Mr. Hawkins stuck his head out of the window and told Ms. Davis, "[B]itch, I see your vehicle, I have a rearview mirror." He then called her a "dumb bitch, stupid bitch, black bitch" before putting his car in park, stepping out, brandishing a gun, and telling her, "[D]on't get killed today." Ms. Davis testified that she put her hands up, and Mr. Hawkins got back in his car and drove away. Ms. Davis then called the police and reported Mr. Hawkins's license plate number, which police used to find and stop Mr. Hawkins. While arresting Mr. Hawkins, officers observed a pellet gun in the driver's side pocket of the car.

In body worn camera (BWC) footage of the arrest, Mr. Hawkins tells officers that as he was backing up his car, "a lady got out of her car and she walked up to [his] door, . . . she was outraged, and she said, 'You almost hit my fucking car!'" In response, he put his pellet gun on his lap and told her, "Lady, back up from my car." Mustafa Ak, a Metropolitan Police Department officer who took part in the arrest, testified that Mr. Hawkins told officers "the same story multiple times."

Mr. Hawkins recounted a similar story at trial, where he testified that after Ms. Davis honked at him for backing up, he rolled down his window and threw his hand out to let Ms. Davis know that he "could see how much of a distance that [he] had to back up." When he continued to back up, Ms. Davis honked again, got out of her car, and walked to the driver's side window of Mr. Hawkins's car while yelling

at him. Mr. Hawkins testified that he never opened the car door to engage with her, but he did put his pellet gun on his lap "[b]ecause [he] felt threatened, and [he] didn't know what she was going to do." Mr. Hawkins also testified that when he was arrested, he asked officers to look for security footage of the incident because he knew he was innocent and that the accusation against him "was a lie" and "was false." Officer Ak confirmed in his testimony that Mr. Hawkins told police that there was a surveillance camera at the scene of his run-in with Ms. Davis, and Officer Ak subsequently emailed the detective on the case to tell him "that there are cameras in these places that might have captured the event to see if he could go review and pull some footage, if it's available."

Although neither the government nor the defense obtained video of the confrontation between Ms. Davis and Mr. Hawkins, evidence at trial provided a glimpse into what that footage might have shown. Specifically, Ms. Davis testified that while she was waiting for officers to arrive, she went to a nearby building to request videos from any security cameras that might have recorded the incident. An MPD officer's BWC footage introduced at trial shows a woman dressed in a security guard uniform describing the building security video to Ms. Davis and the responding officer, telling them "I didn't see anything," "I saw the car and nobody

got out of the car," and "I didn't see anybody get out of the vehicle."[1] The BWC footage shows Ms. Davis repeatedly telling the security guard, "that's crazy," while the security guard informs the officer that she watched the security video from 10 a.m. to past 10:08 a.m., the time at which Ms. Davis called the police. Ms. Davis testified at trial that she remembered telling the security guard, "[I]f you can see me [on the video], I know you seen that vehicle in front of me." Ms. Davis also confirmed that the security guard "was accurate in her description of [Ms. Davis's] movements"—specifically, that she saw Ms. Davis walk around the back of her car—but otherwise contradicted Ms. Davis's version of events.[2]

At the end of the bench trial, Judge Robert Okun found Mr. Hawkins guilty of attempted threats and attempted possession of a prohibited weapon. In making his

---

[1] Judge Okun admitted this video over the government's repeated hearsay objections because it included both hearsay and nonhearsay statements and because the video was relevant to Mr. Hawkins's argument in his motion to suppress his stop (which the court decided as part of the trial) that police had unlawfully stopped him after they had reason to believe—based on the security guard's statements about what she saw on the security footage—that Mr. Hawkins had done nothing illegal. *See Parker v. United States*, 333 A.3d 1162, 1175 (D.C. 2025) (hearsay is admissible at a suppression hearing).

[2] On the BWC footage, the security guard stated that she saw "a black car and then a white car." Ms. Davis testified that when she described Mr. Hawkins's car to officers she "was trying to determine if it was a burgundy vehicle, or if it was red or silver." The trial court found that Mr. Hawkins's car was silver, but it never made any fact finding about the color of Ms. Davis's car. In our view of the BWC footage, it appears that Ms. Davis's car was dark blue or navy.

ruling, Judge Okun explained that although the BWC video of the security guard describing what she saw initially gave him "some pause," it ultimately did not cause him to doubt Mr. Hawkins's guilt because without the security guard's testimony, it was "not clear exactly what video she saw from what angle or the precise time period," and the security guard's description of the video on the BWC footage "was inconsistent not only with Ms. Davis's testimony, who saw the defendant get out of his car, but also with Mr. Hawkins's testimony, who saw . . . Ms. Davis get out of her car." Mr. Hawkins now appeals his convictions.

## II.

Mr. Hawkins argues that he was denied his constitutional right to due process under the Supreme Court's decision in *Brady v. Maryland* when the government failed to alert him—while it could still make a difference—that there was a surveillance video that would contradict Ms. Davis's account of the offenses she accused Mr. Hawkins of committing. We turn first to the facts pertinent to this *Brady* claim.

### A.     Additional Background

Mr. Hawkins first raised the due process issue in a pretrial motion in which he argued, as he argues now on appeal, that the government violated its obligations under *Brady* when it turned over the police officer's BWC footage too late for the

defense to track down the private security camera video whose existence was revealed in that footage. Mr. Hawkins asked the court to "impose discovery and *Brady* sanctions, including but not limited to inferring that the video footage would have discredited the complainant and dismissing the case."

At a motions hearing on the issue, defense counsel informed the court that a few days after the arraignment, his investigator went to the building across the street from the incident to ask about security cameras and was told that the building did not have any video of that location. More than a month later the government disclosed to the defense the BWC footage in which the security guard from that building describes the private security camera video of the activity on the street at the time of Mr. Hawkins's and Ms. Davis's confrontation. Defense counsel stated that although his "investigator was adequate in [in]quiring and taking no for an answer when she had no reason to believe" that video of the incident existed, the BWC footage provided "very good reason to believe otherwise" and gave him a good faith basis for subpoenaing the video if the building denied having such video or failed to share it. But that footage was disclosed too late. The security video— which had been saved "for something like 30 days"—had already been automatically

deleted by the time a defense investigator returned to again request it.[3]

Judge Ann O'Regan Keary, the motions judge, denied Mr. Hawkins's request for sanctions and dismissal under *Brady*. In explaining her reasoning, the judge focused on the lack of any evidence that the private building's security footage (as opposed to the officer's BWC footage) "was ever in the Government's possession." As to the BWC footage, Judge Keary acknowledged that the government turned it over to the defense "too late, in that the video footage had been erased from the private building's security camera." But in her view, this was not "a situation in which the Government was in possession of information that was likely to be helpful to the Defense and failed to provide it to the Defense." At trial later that day, Judge Okun denied Mr. Hawkins's request to revisit Judge Keary's ruling.

## B.     Legal Standards

"The Due Process Clause of the Fifth Amendment to the U.S. Constitution requires that the government timely disclose to the defense information that is 'favorable to an accused,' whether the accused request[ed] it or not." *Biles v. United*

---

[3] Mr. Hawkins's lawyer told the court that according to BWC footage he reviewed, officers had also sought to obtain the security footage, but the building's security team was "sort of unhelpful" and told the officer that he would need to return with a court order. The prosecutor likewise informed the court that "at the time of the arrest, the officers followed up and tried to get the footage" but "[t]hey were unsuccessful."

*States*, 101 A.3d 1012, 1016-17 (D.C. 2014) (citations omitted) (quoting *Brady*, 373 U.S. at 87). A defendant asserting a violation of *Brady v. Maryland* must also show that the favorable evidence "was possessed and suppressed by the government, either willfully or inadvertently" and that it "is material to guilt or punishment." *Toure v. United States*, 335 A.3d 904, 910 (D.C. 2025) (quoting *Andrews v. United States*, 179 A.3d 279, 286-87 (D.C. 2018)). Allowing such claims "is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused." *Brady*, 373 U.S. at 87. The Due Process Clause therefore provides relief to a criminal defendant when the government fails to disclose material evidence "irrespective of the good faith or bad faith of the prosecution." *Id.* "Further, and critically for purposes of this case, the Constitution requires that disclosure be made 'at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case.'" *Miller v. United States*, 14 A.3d 1094, 1107 (D.C. 2011) (quoting *Edelen v. United States*, 627 A.2d 968, 970 (D.C. 1993)). Whether the government violated *Brady* is a mixed question of law and fact: We review the trial court's legal conclusions de novo and its factual findings for clear error. *Id.* at 1120.

### C.     Favorable Information Subject to Disclosure

The government is not disputing that the officer's BWC footage was

favorable, and at oral argument the prosecutor acknowledged that it was "impeaching of what the victim said potentially." The BWC footage was indeed favorable—meaning the defense would have wanted to know about it[4]—in two independent respects. First, the security guard's statements captured on the BWC footage impeached the complainant's account of Mr. Hawkins's actions. *See Vaughn v. United States*, 93 A.3d 1237, 1254 (D.C. 2014) ("Favorable information includes impeaching information."). And second, the security guard's statements indicate that the original surveillance video—the footage that she was describing—was itself favorable, and thus her statements could be used to support a subpoena for the surveillance video, backed up by the Compulsory Process Clause of the Sixth Amendment, which allows a criminal defendant "to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend. VI, cl. 2; *Washington v. Texas*, 388 U.S. 14, 18 (1967).

---

[4] Favorable information is "of a kind that would suggest to any prosecutor that the defense would want to know about it" because it would benefit the defense, *see Miller*, 14 A.3d at 1110 (quoting *Leka v. Portuondo*, 257 F.3d 89, 99 (2d Cir. 2001)), and we evaluate that from the defendant's point of view. *See id.* ("[T]he critical task of evaluating the usefulness and exculpatory value of the information is a matter primarily for defense counsel, who has a different perspective and interest from that of the police or prosecutor." (quoting *Zanders v. United States*, 999 A.2d 149, 164 (D.C. 2010))).

**D.      Suppression and the Timeliness of the Government's Disclosure**

Turning to the second prong of the *Brady* analysis—whether the evidence was suppressed by the government—the government argues at the outset that it cannot have suppressed the private security video because, as the motions court found, the government did not even constructively possess the video. *See Guest v. United States*, 867 A.2d 208, 212 (D.C. 2005) ("If the government does not possess the requested information, there can be no *Brady* violation." (citing *Velasquez v. United States*, 801 A.2d 72, 81 (D.C. 2002))); *see also id.* ("The *Brady* principle does not imply [the government's] duty to investigate—and come to know—information which the defendant would like to have but the government does not possess." (alteration in original) (quoting *Lewis v. United States*, 393 A.2d 109, 115 (D.C. 1978))). But as Mr. Hawkins has all along made clear—before this court and at the hearing on his *Brady* motion—the issue is not the failure to disclose the private security video. The issue is the failure to timely disclose the evidence that showed the potentially exculpatory or impeaching nature of that video. *That* evidence, the officer's BWC footage, was indisputably in the government's possession. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995) (stating that "the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police"); *Vaughn*, 93 A.3d at 1267 (noting the government's "constitutional duty to learn of and disclose to the defense

all the *Brady* information in its actual or constructive possession").

The government acknowledged at oral argument that ideally it should have turned that BWC footage over sooner, but it nonetheless contends that it satisfied its *Brady* obligations by providing the footage to the defense two months before the trial began. The question thus becomes whether this disclosure prior to trial was made in sufficient time for Mr. Hawkins to use the information effectively. *See Miller*, 14 A.3d at 1108.

As to the first respect in which the BWC footage was favorable—the security guard's statements' usefulness in impeaching Ms. Davis's account of the offense— the government's disclosure may well have been made in time to allow for its effective use given that the trial judge himself was able to consider, and did consider, the security guard's statement both for purposes of Mr. Hawkins's suppression motion and as substantive evidence of guilt. *See Gee v. United States*, 54 A.3d 1249, 1268-70 (D.C. 2012) (rejecting the defendant's argument that the government's midtrial disclosure of exculpatory information prejudiced the defense where the defense already had the "basic fact" of that information, used it to cross-examine the complainant, and got as much out of the information as could be gotten with the late-disclosed document). Though the trial court's consideration of the security guard's statements was muddied by the court's and the parties' concern that the statements

might be hearsay, the court ultimately admitted the footage as "relevant for non-hearsay for the trial," and considered it as substantive evidence that "gave [him] some pause."[5] This supports the contention that the defense still had time to effectively impeach Ms. Davis with the content in the BWC footage itself, even if it did not ultimately persuade the judge.[6]

---

[5] The government agrees in its brief that the trial court "received the BWC into evidence and considered the security guard's contemporaneous summary of what she saw in the video"—a characterization, incidentally, that tends to support the statements' admissibility as the security guard's present sense impression. *See, e.g., Hallums v. United States*, 841 A.2d 1270, 1272 (D.C. 2004) (adopting the hearsay exception for present sense impressions as the law of the District); *State v. Johnson*, 508 P.3d 100, 108 (Utah 2022) (holding that as of 2022, the Utah Supreme Court was "unable to find a single federal court of appeals that has held that a lapse of four or even five minutes is too long" to meet the requirements for a present sense impression); *United States v. Obayagbona*, 627 F. Supp. 329, 340 (E.D.N.Y. 1985) (holding that a statement made fifteen minutes after the perceived event was "as spontaneous as possible" and sufficiently contemporaneous to be admissible as a present sense impression). Though Mr. Hawkins's trial lawyer argued, among other things, that Ms. Davis adopted the security guard's characterization of what happened by not contradicting it when it was made, Judge Okun was right to be skeptical of treating the security guard's statements as admissions of a party opponent given that Ms. Davis was not Mr. Hawkins's party opponent. *See, e.g., Freeland v. United States*, 631 A.2d 1186, 1193 (D.C. 1993) (noting that the United States is the party opponent of the defendant in criminal cases); 6 Michal H. Graham, *Handbook of Federal Evidence* § 801:15 (10th ed. 2025) ("Complaining witness is not a party-opponent.").

[6] Mr. Hawkins cannot persuasively claim under the circumstances here that the late disclosure of the BWC footage violated *Brady* on the grounds that the defense did not have time to subpoena the security guard as a live witness. Mr. Hawkins had two months after disclosure to find the security guard—and in fact

It is more clear, however, that the timing of the government's disclosure of the BWC footage did preclude Mr. Hawkins from effectively using it for the second way in which the BWC footage was favorable—its revelation of the potentially exculpatory or impeaching nature of the original surveillance video. The government does not dispute, for example, that the private security footage could have been obtained through earlier and more diligent efforts.[7] Everyone—from the government to the defense to Judge Keary—agreed that "in the normal scheme of things" private security recordings are "taped over after 30 days," meaning that if the government had shared the BWC footage shortly after arraignment, then the defense would have had strong grounds for subpoenaing the video and ensuring its preservation.[8] *Cf.*

---

tried to find her—and does not appear to be arguing that he could have found her if the disclosure had been earlier. More importantly, the BWC footage itself was likely just as persuasive, if not more persuasive, than the security guard's live testimony would have been. As defense counsel himself noted, it was hard to say "what memory this person would have four months after the incident of video that she watched for a few minutes over the summer."

[7] Rather than argue that the private footage might not have been obtainable regardless of when the defense received confirmation of its existence, the government suggests that we can infer from the defense's failure to subpoena the video *before the defense had confirmation of its existence* that perhaps the defense did not actually want the video at all. But the government—which knew from day one that the video existed—also failed to obtain it. That neither party subpoenaed the video tells us nothing about what the video showed.

[8] It is worth noting here that while a defendant need not request the favorable information for its suppression to constitute a *Brady* violation, the defense sent an investigator to try to locate the security video before it even had corroboration from

*Sykes v. United States*, 897 A.2d 769, 770, 781 (D.C. 2006) (holding that the government's late disclosure of favorable information and "the consequent inability of the government or the defense to locate two potential defense witnesses who had given grand jury testimony that was favorable and potentially exculpatory" violated appellant's due process rights under *Brady*); *United States v. Valenzuela-Bernal*, 458 U.S. 858, 874 (1982).

Given the risk that evidence will become unavailable or unusable, "timely disclosure obligation with respect to *Brady* material can never be overemphasized, and the practice of delayed production must be disapproved and discouraged." *Miller*, 14 A.3d at 1108 (quoting *Boyd v. United States*, 908 A.2d 39, 57 (D.C. 2006)). Although "[i]t is not feasible or desirable to specify the extent or timing of disclosure *Brady* and its progeny require," *id.* at 1111 (alteration in original) (quoting *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001)), "'as soon as practicable' should be the approach," *Vaughn*, 93 A.3d at 1257 (quoting *Miller*, 14 A.3d at 1108). We are mindful that the prosecutor's job is a difficult one. *See id.* at 1253 (describing

_____

the BWC footage that the video was exculpatory. Once the defense found out the video had been destroyed, it argued *before trial* that the failure to timely disclose the BWC footage was a *Brady* violation requiring a remedy. This is thus not a case where the defendant is seeking in the first instance on appeal to upset the finality of a verdict based on newly discovered evidence (though even then, of course, we would be bound to find a reversible *Brady* violation if the suppressed evidence were material).

the "dual role" that prosecutors are obligated to play at trial); *In re Taylor*, 73 A.3d 85, 100 (D.C. 2013) (stating that we entrust to prosecutors "the power of prosecuting crimes, and with it 'the terrifying force of the criminal justice system'" (quoting *Robertson v. United States ex rel. Watson*, 560 U.S. 272, 273 (2010) (Roberts, C.J., dissenting from order dismissing certiorari as improvidently granted))). "A *Brady* violation cannot be predicated on the government's failure to do the impossible and disclose evidence that does not yet exist." *Turner v. United States*, 116 A.3d 894, 917 (D.C. 2015). We nonetheless conclude that here, where the government knew of the existence of the surveillance video and its potentially exculpatory nature at the moment the security guard described it to the MPD officer and Ms. Davis shortly after the incident, and where the government also knew such surveillance video is typically deleted within thirty days, it did not disclose this favorable information in time for Mr. Hawkins to use it effectively.

## E.     Materiality

The third prong of *Brady* involves the materiality of the suppression or late disclosure of information beneficial to the defense. "[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433-34

(quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)). Therefore, our "touchstone of materiality is a '*reasonable* probability' of a different result, and the adjective is important." *Id.* at 434 (emphasis added) (citing *Bagley*, 473 U.S. at 678). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*

We do not have the surveillance video in front of us to determine its precise content. But we do know from the security guard's description, which the government gives us no sound reason to discredit, that the video was at odds with key aspects of the complainant's account—specifically in that it shows no one leaving their car. The question of materiality thus seems to turn on the extent to which having the actual surveillance video, not merely the BWC footage of the security guard's description of the video, would affect the trial court's reasoning.

In this regard the record speaks for itself. It is more than reasonably probable that having the surveillance video—which, again, the security guard characterizes as contradicting the complainant's account—would have made a difference in the outcome of Mr. Hawkins's trial. We put little stock in the fact that the trial court itself did not make much of the discrepancy between the security guard's description

of the video and the complainant's account. For one, Judge Okun's view was not that the contradiction was unimportant or somehow resolved, but that the security guard's description also ran counter to Mr. Hawkins's own account of events, in which the complainant was the one to get out of her car. Yet Mr. Hawkins did not bear the burden of proof,[9] *see Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993), and a situation in which neither the account of Mr. Hawkins nor the account of Ms. Davis could possibly be true presumably would amount to reasonable doubt.[10] Further, the trial court treated the security guard's description in the BWC footage as an out-of-court assertion that would have to come in under a hearsay exemption or exception to be admissible as substantive evidence at trial. So the security guard's statement, however credible, was still one step removed from the actual video, its

---

[9] And if the defense had access to security footage directly contradicting Ms. Davis's account, and assuming the government went forward with its prosecution even after such exonerating evidence became known, Mr. Hawkins "might not have testified at all," thus giving no account that could run counter to the footage's depiction of events. *See Harrison v. United States*, 392 U.S. 219, 226 (1968); *id.* at 223 ("The question is not whether the petitioner made a knowing decision to testify, but why.").

[10] In *Boyd v. United States*, for example, there was undisclosed evidence that a witness saw only one person during the charged incident that was inconsistent with the government's allegation that there were four people involved *and* with the defendant's account that three people were involved. 908 A.2d 39, 55-56 (D.C. 2006). That the undisclosed evidence also contradicted the defendant's account of what took place did not affect the materiality of the evidence, and we still concluded that the government violated *Brady* by failing to disclose evidence that plausibly impeached the government's version. *Id.* at 61.

impact lessened by uncertainty over the extent to which it was actually admissible for its truth.

The government argues that Mr. Hawkins failed to show that the pretrial motion judge clearly erred in finding that it was "fairly speculative" that the private security footage would have helped him. Although the clearly erroneous standard of review is highly constraining, "it does not relieve us of our obligation to conscientiously review the trial court's finding based on the record presented." *(Dominique) Hawkins v. United States*, 248 A.3d 125, 130-31 (D.C. 2021) (reaching a different fact determination from the trial court based on BWC footage, even where the video did not "blatantly contradict[]" the trial court finding); *see also Ward-Minor v. United States*, 316 A.3d 438, 447 (D.C. 2024) (concluding that BWC footage contradicted an implicit finding of fact by the trial judge). Where, like here, objective evidence like BWC video footage exists, "we do not find ourselves constrained on review by an inability to assess 'factors that could only be ascertained after observing the witness testify,'" and our review can instead be more probing, even under the clear error standard. *See Stringer v. United States*, 301 A.3d 1218, 1229 (D.C. 2023) (quoting *Caston v. United States*, 146 A.3d 1082, 1099 (D.C. 2016)); *see also Ward-Minor*, 316 A.3d at 447.

Arguably, the question whether a piece of evidence is sufficiently helpful to be considered material for *Brady* purposes is a question of law, not fact. Viewed as a legal ruling, Judge Keary's finding that the utility of the private surveillance footage was "speculative" (based only on the defense attorney's description of the BWC footage rather than her own viewing of it), misses how the tape would have been helpful, as explained above. If the judge's finding is instead considered a factual finding that the tape simply contained no footage that might contradict the complainant—which is how both parties frame the issue in their briefs—we are bound by this record to deem that finding clearly erroneous. In other contexts, we have explained that something is "speculative" if it is based on a "guess," *Jimenez v. Hawk*, 683 A.2d 457, 461 (D.C. 1996) (quoting *Courtney v. Giant Food, Inc.*, 221 A.2d 92, 94 (D.C. 1966)), something less than a "likelihood," *Fraternal Ord. of Police Metro. Police Dep't Lab. Comm. v. District of Columbia*, 290 A.3d 29, 38 (D.C. 2023) (emphasis omitted), less than a preponderance of the evidence, *In re D.M.*, 94 A.3d 760, 769 (D.C. 2014), and less than a "reasonable inference," *Hager v. United States*, 791 A.2d 911, 913 (D.C. 2002). Here, the BWC footage provided more than simply "a guess" about what the private security camera footage would show—it provided a fairly detailed description from an unbiased witness immediately after she viewed the relevant events.

The government relies on *Briscoe v. United States*, 181 A.3d 651, 654-55 (D.C. 2018) (holding that appellant failed to show the government had possession of the footage), but in *Briscoe* the claimed *Brady* material was *private* security footage, not the BWC footage indisputably in the government's possession, and the value of the alleged *Brady* material was *entirely* speculative. There was no evidence that the camera attached to a private building was actually filming, and, as the government characterizes *Briscoe* in its brief, "there was no evidence that [the] missing video"—if it even existed—"would have been exculpatory." *See id.* at 655 n.4. Here, on the other hand, all of the evidence about the private security video supports a conclusion that the video existed and that it directly contradicted the heart of Ms. Davis's allegations.

The government's citation to *Terry v. United States*, 114 A.3d 608 (D.C. 2015), is also unpersuasive. There, the defense unsuccessfully argued that the late disclosure of an eyewitness statement that the shooter was in the driver's seat (not the passenger seat, where the defendant was sitting) was prejudicial because, had this evidence been disclosed sooner, the defense could have "investigated who was in the [car] in an attempt to assert a third-party perpetrator theory at trial." *Id.* at 620-21. We concluded that because eyewitness descriptions, security footage, and DNA evidence all supported a finding that Mr. Terry was the shooter, it was "just too speculative to conclude that earlier pursuit of this information would have led to

a discovery of some exculpatory information." *Id.* at 622-23. But here, the evidence against Mr. Hawkins was not so strong as to make the existence of exculpatory information "speculative"—this was essentially a he-said-she-said trial without any forensic evidence. And while the defense in *Terry* argued that earlier disclosure *could* have prompted an investigation that *may* have led to more evidence supporting a hypothetical defense, here it requires less than "a small, logical step to conclude that" the private footage "might well contain information" exonerating Mr. Hawkins. *See Askew v. United States*, 229 A.3d 1230, 1244 (D.C. 2020) (quoting *Koonce v. District of Columbia*, 111 A.3d 1009, 1018 (D.C. 2015)). The security guard said it did. And unlike the hypothetical third-party theory in *Terry*, the theory here was concrete (video footage contradicting Ms. Davis's testimony) and specifically described (the security guard stated the location shown on the footage and the time stamps she viewed).

Further, the Supreme Court has endorsed "a relaxation of the specificity required in showing materiality" where the favorable information in question has been lost. *Valenzuela-Bernal*, 458 U.S. at 870, 874. In *United States v. Valenzuela-Bernal*, the government's deportation of potentially exculpatory witnesses made evidence unavailable to the defense, and "neither respondent nor his attorney was afforded an opportunity to interview the deported witnesses to determine what favorable information they possessed." *Id.* at 870. Under those circumstances, the

Court held that the defendant need only provide "some plausible explanation of the assistance he would have received from the testimony of the deported witnesses." *Id.* at 871; *see also id.* at 874 (stating that in determining materiality, "courts should afford some leeway for the fact that the defendant necessarily proffers a description of the material evidence rather than the evidence itself").

It is true, as Judge Okun observed, that we cannot know "exactly" what the security guard saw or the "precise time period" she viewed.[11] But the security guard's statement that she saw Ms. Davis's car and the car directly in front of hers and that she watched from 10 a.m. and watched past 10:08 (when Ms. Davis said she called the police, promptly after the incident) is persuasive evidence—and certainly a plausible showing—that the private security camera was directed at the scene of the incident and that the guard saw the relevant period of footage. The government does not suggest that the security guard had any reason to lie, and Ms. Davis's own comments on the BWC footage corroborate aspects of the guard's account. Ms. Davis can be seen nodding as the security guard describes seeing Ms. Davis come "around the back way" of her own car. And when the security guard

---

[11] Judge Okun also credited Ms. Davis's testimony—thereby implicitly discrediting the security guard's description—because Ms. Davis was "the one who was looking for video in nearby building to show what happened." It is worth noting, though, that Mr. Hawkins likewise asked officers to look for footage and told Officer Ak that there was a camera at the scene.

describes seeing other people "walking right next to [Ms. Davis]" along the sidewalk, Ms. Davis nods again and can be heard saying "yeah, they was walking right there." After confirming that she placed her call to 911 at 10:08 a.m. and hearing the security guard say she had viewed footage from 10 a.m. through 10:08 a.m., Ms. Davis did not question that this eight-minute stretch would have captured the incident.[12] Her silence in that regard, her agreement with the other aspects of the security guard's observations, and even her comment that "that's crazy" when the security guard says she did not see anyone get out of a car in front of Ms. Davis's car give the impression that, in Ms. Davis's view, the security guard was viewing the appropriate period and not the aftermath of the incident.[13]

---

[12] If anything, her comments to the security guard reveal concern that the guard did not watch *late* enough to view the interaction. At one point, before checking her call record, Ms. Davis mistakenly thought that she called police at 10:16, not 10:08, and she asked the guard "did you go up to 10:16?" This further indicates that, from Ms. Davis's perspective on the morning of the incident, footage of the scene immediately before the 911 call that Ms. Davis placed immediately after the incident would capture the interaction.

[13] Contrary to our dissenting colleague's view that "the evidence strongly supports a conclusion that the time segment the SPO watched was recorded *after* the incident in question," *post* at 28, the most probative evidence in the record establishes that any interaction between Ms. Davis and Mr. Hawkins took place between 10 a.m. and 10:08 a.m. Three key facts are undisputed: (1) the whole interaction took less than two minutes, (2) Ms. Davis called 911 "almost immediately" after the incident, and (3) the 911 call came in at 10:08 a.m. That places the alleged incident firmly within the 10 a.m. to 10:08 a.m. timeframe. The

We are therefore left with a situation where the government did not turn over the favorable evidence in time for the defense to make effective use of it, and we will never be able to see the surveillance video. It does not matter that, as the government observes, the defense has not "proffer[ed] any new evidence to corroborate his claim" in advance of this appeal. The private-security-camera evidence is gone, not through any fault of the defense, but because the government failed to alert Mr. Hawkins to its existence while it could still be subpoenaed. Under these circumstances, Mr. Hawkins's trial did not result in a "verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

---

more specific and objective evidence supporting this time frame—including Ms. Davis's confirmation, while looking at her phone's call log, that she called police at 10:08 and Officer Ak's testimony that the call "came out at 10:08 in the morning"— effectively contradicts Ms. Davis's and Mr. Hawkins's vague references to events happening earlier in the nine o'clock hour. Both witnesses' own subsequent testimony also refutes their hazier comments about an earlier timeline. Ms. Davis explicitly acknowledged that she could not actually remember what time the incident took place but knew "it was in the morning." And Mr. Hawkins's testimony that ten minutes after he pulled out of the parking spot he picked up a friend and headed to his job at CVS for his 10:30 a.m. shift—corroborated by Officer Ak's testimony that he actually stopped Mr. Hawkins around 10:30 a.m. near CVS, five or ten minutes away from the scene of the alleged offense—demonstrates that his post-incident activities took far less than ninety minutes. It requires significantly more speculation to suppose that Ms. Davis waited around to call 911 (contrary to her testimony that she "didn't wait around to make the 9-1-1 call") than to assume the witnesses did not have a specific memory of the exact time of day they were parked next to each other (an assumption that echoes Ms. Davis's candid acknowledgement of exactly that).

## III.

For the foregoing reasons, we vacate both convictions and remand for further proceedings consistent with this opinion.[14]

---

[14] Because Mr. Hawkins's conviction for attempted possession of a prohibited weapon required the government to prove that Mr. Hawkins possessed the weapon "with the intent to use it unlawfully, in this case to threaten Ms. Davis," *see* D.C. Code § 22-4514(b) ("No person shall within the District of Columbia possess, with intent to use unlawfully against another, an imitation pistol . . . ."), that conviction, along with the attempted threats conviction, is affected by the *Brady* violation. In light of our disposition on the *Brady* claim, we do not address Mr. Hawkins's arguments that the trial court erred when it denied his request for a remedy for discovery violations under Rule 16, allowed an impermissible constructive amendment of the charging information, "acted as a prosecutor against him" when it posed questions to Mr. Hawkins but not to the government witnesses, and made findings not supported by the record. We do address Mr. Hawkins's challenge to the sufficiency of the evidence of attempted threats, however, "because a ruling in Mr. [Hawkins's] favor on that issue would bar retrial on Double Jeopardy grounds." *Evans v. United States*, 122 A.3d 876, 886 (D.C. 2015). Viewing the evidence in the light most favorable to the verdict—particularly the evidence that Mr. Hawkins stepped out of his car, brandished his gun, and told Ms. Davis "don't get killed today"—we conclude that a reasonable factfinder could determine beyond a reasonable doubt that the government had proved each of the elements of attempted threats. *Roberts v. United States*, 216 A.3d 870, 886 (D.C. 2019) ("To support a threats conviction, the prosecution must prove beyond a reasonable doubt that the defendant (1) communicated with another person in a manner that an 'ordinary hearer would reasonably' understand to be a threat to do bodily harm and (2) 'acted with the purpose to threaten or with knowledge that [the defendant's] words would be perceived as a threat.'" (alteration in original) (quoting *Carrell v. United States*, 165 A.3d 314, 319-20, 325 (D.C. 2017) (en banc))); *Thomas v. United States*, 249 A.3d 802, 805 (D.C. 2021) ("[P]roof of the completed offense of threats suffices to support a conviction for attempted threats."). Mr. Hawkins argues that the government failed to satisfy the purpose element because he knew his gun was inoperable and because Ms. Davis testified that she did not, in fact, "really feel

*So ordered.*

THOMPSON, *Senior Judge*, dissenting: I agree with my colleagues that the government failed to make a timely disclosure of the body-worn camera (BWC) footage that showed, per the statements of a special police officer (SPO), that there was private surveillance video footage of the scene of the alleged incident and that the portion of the surveillance footage that the SPO watched did not show what the complainant alleged. Given what I believe is common knowledge that surveillance video footage often is overwritten or erased thirty days after recording, I agree that the government was obliged under *Brady* to disclose the BWC footage before a time when, it could reasonably be expected, the surveillance video footage would no longer exist.

However, in my view, the record in this case does not establish a reasonable probability that the outcome of Mr. Hawkins's trial would have been different if the surveillance video had been timely disclosed. Even though the SPO did not see on the surveillance footage what the complainant alleged, I see no reason for a lack of confidence in the verdict. That is because, in my view, the evidence strongly

---

intimidated by him." But regardless of what Mr. Hawkins knew about the actual danger posed by his gun or what Ms. Davis subjectively felt, "a jury could still reasonably conclude that an ordinary person in [Ms. Davis's] position would read" Mr. Hawkins's actions and statement "as intentional threats to do bodily harm." *Roberts*, 216 A.3d at 886.

supports a conclusion that the time segment the SPO watched was recorded *after* the incident in question (and we are left entirely to speculation regarding what other segments of the surveillance video might have shown).

As shown on the BWC footage, the SPO told police officers that she watched the surveillance footage of the time period from 10:00 to past 10:08. The SPO explained that she watched that time segment because the complainant had told her that she called 911 to report the incident at 10:07. (The BWC footage shows the complainant checking the call record on her cell phone and verifying that she actually called 911 at 10:08.)

During her trial testimony, however, the complainant stated that the incident, which transpired over a period of "less than two minutes," happened as she was sitting in her car "around 9-ish" and the driver of the car parked in front of hers began backing up. During his testimony, Mr. Hawkins similarly estimated that it was "9:20-ish" or "9:15-ish" when he got into his vehicle, put his car into reverse, and began backing up and the incident occurred. Although Mr. Hawkins did not estimate the duration of the incident, his description of what occurred is consistent with the complainant's description of a "less than two minute[]" incident. Thus, the undisputed trial testimony was that the incident occurred started and was over before

10:00.[1]

As both the complainant and Mr. Hawkins described the incident, it involved someone getting in and out of a car. The complainant testified that after she honked at the driver who was parked in front of her (Mr. Hawkins), he stepped out of his car and brandished a gun, and then got back in his car, made a U-turn, and drove away. Mr. Hawkins testified that he got into his car, put on his seatbelt and started the car, and began backing it up, after which the complainant began honking at him, got out of her vehicle, approached his car aggressively, and then got back into her vehicle before he made a U-turn and left.

Contrast both accounts to what the SPO described seeing on the 10:00 to "past 10:08" surveillance video footage: The SPO saw no one "get out" of a car and also "didn't see anybody get in a car." Thus, according to the SPO's account (which I agree we have no reason to discredit), the footage she viewed (i) did not show Mr. Hawkins getting in his car at the start of the incident; (ii) did not show Mr. Hawkins getting out of his car (before approaching the complainant's vehicle, according to

---

[1] Although the complainant agreed on cross-examination that it was "fair" to say that she made her 9-1-1 call to police "almost immediately after the incident," the other trial testimony provides good reason not to interpret that imprecise answer to a leading cross-examination question as indicating that the incident occurred during the 10:00 to "past 10:08" time-period.

the complainant's account) and also did not show Mr. Hawkins getting back into his car (after what the complainant described as his gun-brandishing); and likewise (iii) did not show the complainant getting back into her vehicle after having gotten out of her vehicle and approached Mr. Hawkins's car (which is what occurred according to Mr. Hawkins's account).[2]

Rather than suggest that the surveillance video footage that the SPO viewed was favorable to Mr. Hawkins (in that it did not show what the complainant alleged), the foregoing persuades me that the footage the SPO viewed simply did not show what happened during the relevant time period. It also does not indicate one way or the other what the footage of the relevant time period would have shown. I agree that it is reasonably probable that the full surveillance video would have been relevant, but it is speculative that it would have been helpful to the defense and would have made a difference in the outcome of Mr. Hawkins's trial.

---

[2] The SPO explained that she did see the complainant walk toward the back and around her car and toward a building on the same side of the street where her car was parked, which appears to be what the complainant did post-incident as she canvassed for possible surveillance video footage of the incident. The complainant can be heard on the BWC footage stating that the video footage from one of the buildings was "too blurry."

For all the foregoing reasons, I would not disturb the guilty verdict. I therefore respectfully dissent.